**In re Bruce H. ROSWICK, Debtor.**

**Ian J. Gazes, as Chapter
7 Trustee, Plaintiff,**

**v.**

**Bruce H. Roswick and Melanie
Roswick, Defendants.**

Bankruptcy No. 97–B–40255 (JHG).
Adversary No. 98–8414A.

United States Bankruptcy Court,
S.D. New York.

March 25, 1999.

Abraham Borenstein, Bloom Borenstein, P.C., Springfield, NJ, for Chapter 7 Trustee.

Bruce H. Roswick, New York City, Pro se.

James Sherwood, Bennette Kramer, Schlam, Stone & Dolan, New York City, for Melanie Roswick.

### DECISION AFTER TRIAL

JEFFRY H. GALLET, Bankruptcy Judge.

Ian J. Gazes, the Chapter 7 Trustee (the "Trustee"), seeks to sell a cooperative apartment located at 40 East 88th Street in Manhattan (the "Apartment") pursuant to § 363(h) of the United States Bankruptcy Code (the "Code").[1] The Apartment is owned by Bruce H. Roswick ("Bruce"), a well-known bankruptcy lawyer who represents himself in this adversary proceeding, and nondebtor Melanie Roswick ("Melanie"), his wife.

The trial lasted nine days, during which eleven witnesses testified, including both

---

1. The court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This is a core matter under 28 U.S.C. § 157(b)(2)(A).

Bruce and Melanie (collectively the "Roswicks"). For the reasons that follow, I find that the Roswicks each own a 50% interest in the Apartment and Bruce's interest passes to the Trustee; authorize the Trustee to sell the Apartment; and dismiss all of the Roswicks' affirmative defenses.

## LAW: SALE OF APARTMENT

A bankruptcy trustee is charged with several obligations spelled out in §§ 323 and 704 of the Code. One of them, when appropriate, is to liquidate the debtor's assets in a manner most beneficial to the estate. *See* 11 U.S.C. § 704(1).

The Trustee seeks authority pursuant to § 363(h) of the Code to sell the Roswicks' interest in the Apartment. That section provides, in relevant part:

> Notwithstanding subsection (f) of this section, the trustee may sell both the estate's interest, under subsection (b) or (c) of this section, and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety, only if—
>
> (1) partition in kind of such property among the estate and such co-owners is impracticable;
>
> (2) sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners; [and]
>
> (3) the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners;

11 U.S.C. § 363(h).[2]

In determining whether the benefit to the estate outweighs the detriment to Melanie, I must consider both economic and noneconomic factors. *See Community Nat'l Bank & Trust Co. v. Persky (In re Persky )*, 893 F.2d 15, 20 (2d Cir.1989); *Bakst v. Grif-*

*fin (In re Griffin )*, 123 B.R. 933, 936 (Bankr. S.D.Fla.1991). Once the Trustee makes a "prima facie case demonstrating that the estate would benefit from the sale of the residence, the burden shifts [to Melanie] to show facts indicating why this sale should not be approved." *Grabowski v. Sapir (In re Grabowski )*, 137 B.R. 1, 3 (S.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992).

The Code provides a nondebtor co-owner certain protections. For example, the nondebtor has the right to purchase the property at the trustee's proposed sale price. *See* 11 U.S.C. § 363(i). If the co-owner does not purchase the property from the trustee, she is entitled to a percentage of the sale proceeds according to her interest. *See id.* § 363(j).

## FACTS

### A. *Family Background*

Since the late 1970's, Bruce, now 54, has practiced bankruptcy law. Before that, he practiced real estate law and was a title closer. He is the author of several articles on bankruptcy and real estate law. Bruce currently works out of the Apartment's maid's room and is in the process of changing the focus of his legal practice. In 1997 and 1998, Bruce averaged approximately $120,000 in gross annual income.

His practice has centered on debtor representation in bankruptcy court. He testified that his business has been slow over the past several years and that he intends to stop representing debtors. Indeed, he testified that he recently turned down perspective debtors seeking to retain him. He also testified that he intends to direct his efforts to law related business ventures. Bruce has no specific plan to either enter business or obtain new, nondebtor clients.

Melanie, 53, is a college graduate with little employment experience. She periodically worked for her father and, in or around 1996, worked for eighteen months as a part-time receptionist at a doctor's office. She

---

**2.** Subsection (4) of § 363(h) adds the additional requirement that property may be sold only if "such property is not used in the production, transmission, or distribution, for sale, of electric

energy or of natural or synthetic gas for heat, light, or power." The Roswicks conceded that they do not so use the Apartment.

848

earned approximately $7,000 per year as a doctor's receptionist.

Melanie's primary vocation has been raising the couple's two children and maintaining the family home. Currently, she is a sales trainee at Charles Greenthal & Co. ("Greenthal"), a New York City real estate firm. In 1998, she passed the New York State real estate salesperson's licensing examination. Corrine Pulitzer ("Pulitzer"), the Greenthal executive responsible for the education of new sales associates, testified that about half of those she brings into Greenthal's training program earn a living, defined as at least $50,000 a year, as a real estate salesperson.

The Roswicks were married in 1977. Upon their marriage, they moved into Bruce's apartment in Brooklyn Heights, New York. In 1978, Melanie gave birth to their first son, William Roswick. In late 1978 or 1979, they moved to an apartment located at 444 East 86th Street in Manhattan. In 1981, Melanie gave birth to their second son, John Roswick. With the growth of their family, the Roswicks sought larger accommodations.

B. *The Apartment*

In 1986, the Roswicks and their two sons moved into the Apartment. On March 19, 1986, the Roswicks entered into a proprietary lease for the Apartment and purchased 575 shares in 40 East 88th Street Owners, Inc. (the "Cooperative") for about $610,000. The Proprietary Lease and corresponding stock certificate recite that the Roswicks purchased the Apartment as joint tenants, with right of survivorship.

The Roswicks funded the purchase from three sources. First, they used the proceeds of a $250,000 loan from Chemical Bank ("Chase").[3] Soon after the purchase, this loan was replaced by a loan secured by a mortgage on the Apartment. Second, they paid approximately $50,000 from their joint account. Third, they paid $310,000 from a trust established by Bruce's mother for the benefit of their sons John and William Roswick. Bruce was the draftsman and sole trustee of that trust.

At, or about, the time the Roswicks purchased the Apartment, they entered into a recognition agreement (the "Recognition Agreement") with the Cooperative and Chase. The Recognition Agreement provides, in part:

2(b) [The Roswicks have] agreed that, without [Chase's] written approval, [the Roswicks] will not exercise any right that [they] may have under the lease to terminate the lease so long as the loan is outstanding. Accordingly [the Cooperative] will not consider any attempt to do so effective.

(c) [The Cooperative] will notify [Chase] of any notice of intention to terminate the Lease, and

(1) If the [Roswicks] default can be cured by the payment of money, [the Cooperative] will also notify [Chase] promptly of any default involving an amount equal to or exceeding three months maintenance payments and will take no action to terminate the Lease or cancel the shares if the default be cured either by [Chase] for the account of the [Roswicks] or by the [Roswicks] within 15 days after such notice of default or intention to terminate; or

\*　\*　\*　\*　\*　\*

(d) [The Cooperative] will accept payment from [Chase] on behalf of [the Roswicks] of any sums due under the Lease (including its deficiency clause), any payments made by [Chase] under the terms of this agreement will be deemed so paid, and no payments made in accordance herewith shall be deemed to limit [Chase's] rights against the [Roswicks] pursuant to law.

*Recognition Agreement* at ¶ 2(b)–(d).

In order to carry the Apartment, the Roswicks must pay $2,686.53 per month in debt

3. Chemical Bank merged with Chase Manhattan Bank. Thereafter, Chemical Bank changed its name to Chase Manhattan Bank.

service to Chase and $1,920 per month in maintenance charges (rent) to the Cooperative, $4,606.53 in all. Since 1996, they have paid neither. Chase has paid the maintenance charges to the Cooperative.

The Apartment is located in the Carnegie Hill section of Manhattan. Carnegie Hill is bounded by 86th and 96th Streets, to the south and north, and Fifth and Park Avenues, to the west and east. It is one of New York City's most prestigious and expensive neighborhoods. The Apartment, whose interior perimeter measures more than 1,800 gross square feet, is a "Classic 6," in a prewar, doorman building. It has two bedrooms, two bathrooms, a kitchen, a dining room, a living room, with a working fireplace, and a maid's room with its own bathroom.

John Roswick, now seventeen, occupies one of the bedrooms while he attends private high school at the Riverdale Country School in the Bronx. The Roswicks pay about $15,-000 per year for his tuition. In addition, during their financial difficulties in 1996, the Roswicks acquired a new 1996 "Land Cruiser," which they put in Melanie's name, that John Roswick drives to and from his private high school each day.

William Roswick, a college sophomore, who attends college away from home, shares that room with his younger brother during school vacations. The Roswicks did not testify as to the amount of his college tuition or how it is paid.

The Roswicks occupy the other bedroom.

John Miller, President of Miller Samuel, Inc., a real estate appraisal firm, viewed and measured the Apartment on January 14, 1999. He opined that the Apartment has a fair market value of $1,050,000.[4] The Defendants did not offer their own appraiser. However, Pulitzer testified that Miller Samuel is a respectable firm sometimes recommended by her firm. In addition, I received evidence of an offer of $975,000 for the Apartment.[5]

## C. Defaults on the Apartment

Over the past several years, the Roswicks have been periodically in default on their maintenance and mortgage obligations.

In 1994, the Roswicks failed to make maintenance payments to the Cooperative. The Cooperative commenced a landlord/tenant proceeding. The proceeding was resolved by the Roswicks' paying their maintenance to the Cooperative.

In March 1995, the Roswicks again stopped paying their maintenance. On, or about, June 23, 1995, the Cooperative started a "Non–Payment Proceeding" solely against Bruce (the "Eviction Proceeding").[6] The petition alleged maintenance arrears of about $8,564.00 (four months' maintenance plus $100 in legal fees).

As more fully addressed later, this proceeding had several irregularities. In New York State, a nonpayment summary proceeding must be preceded by a "rent demand," of no less than three days before the commencement of the summary proceeding. However, the parties may extend the rent demand period by agreement. Here, the Proprietary Lease extended the statutory notice period to five days. A proper rent demand is a jurisdictional prerequisite to the

---

4. Mr. Miller originally advised the Trustee that the Apartment's fair market value was $925,000. That opinion was given before he viewed the interior of the Apartment.

5. There was some evidence that the Roswicks were sometimes less than cooperative with brokers showing the Apartment. This may have had some effect on the offer received. Jonathan Edwards, a broker with Douglas Elliman, testified that Bruce prevented him, on several occasions, from showing the Apartment to several potential purchasers. He provided one example where Bruce met him in the lobby of the Apartment's building. Bruce, who was on his way out, told Edwards and his potential purchasers, that he could not show the Apartment until Melanie and their son left. Edwards waited but never saw Melanie and her son leave because they used the service elevator. Bruce returned from his errand but did not invite Edwards in. Edwards, however, never asked the doorman to call the Roswicks in the Apartment. Rather, after several minutes, he left. The Trustee's argument that Bruce obstructed showings of the Apartment is unproven. I believe that Bruce was dangerously close to obstructing the Trustee in his duties. However, I certainly take those facts and weigh them in determining his credibility.

6. 40 East 88th Street Owners Corp. v. Bruce H. Roswick, No. 85289–95 (N.Y.C.Civ.Ct.1995).

maintenance of a nonpayment summary proceeding. *See* N.Y. Real Prop. Acts. § 711(2).[7] *See generally* Finkelstein & Ferrara, *Landlord and Tenant Practice in New York,* 14:14 (West 1999). The demand here was a three-day demand, only to Bruce, to pay an entity named "40 East 88th Street Owners Corp." The Cooperative is "40 East 88th Street Owners, Inc."

The petition named, and was served on, only Bruce, although Melanie, the co-lessee, was a necessary party. The named plaintiff was "40 East 88th Street Owners Corp.," not the Cooperative, "40 East 88th Street Owners, Inc." More important, the premises sought to be recovered was described as "40 East 80th Street Apartment 11–F." The Apartment is located on 88th Street.

Bruce testified that he was aware of these defects and, as a result, defaulted. On August 14, 1995, a "Decision and Judgment of Possession" was entered against him. Thereafter, a warrant of eviction was issued.

In October 1995, Chase paid the Roswick's maintenance arrears. The Roswicks' remained in undisturbed possession of the Apartment.

In March 1996, the Roswicks, for a third time, stopped paying their maintenance. In November 1996, Chase paid the overdue amount in a lump sum of $13,000 to the Cooperative. Chase continues to pay the Roswicks' maintenance to date. In all, Chase has paid more than $67,000 of the Roswicks' maintenance to the Cooperative.

Three months later, in June 1996, the Roswicks stopped paying debt service on their Chase loan. They have made no payment since. It is undisputed that since 1986 when they paid debt service, they paid from the proceeds of Bruce's law practice.

Marcia McClinton ("McClinton"), a litigation liaison officer and former foreclosure supervisor for Chase, testified that the Roswicks owe Chase the following:

| | |
|---|---|
| $128,028.35 | Pay off Amount of Mortgage Principle |
| $ 34,126.28 | Interest |
| $ 5,530.00 | Attorneys' fees |
| $ 159.00 | Property Preservation Charge |
| $ 67,111.02 | Maintenance fees |
| $ 47.00 | Pay off fees |
| $236,667.28 | Total[8] |

### D. Bruce Roswick's Bankruptcy

Starting in 1993, Bruce began experiencing financial difficulties. He blames nonpaying clients for his financial downfall. He filed a voluntary petition under chapter 11 of the Code on January 14, 1997. He annexed Schedules B and G to his petition, which listed his interest in the shares of the Cooperative and Proprietary Lease of the Apart-

---

**7.** Subsection 2 of the New York Real Property Actions and Proceedings Law provides:

A tenant shall include an occupant of one or more rooms in a rooming house or a resident, not including a transient occupant, of one or more rooms in a hotel who has been in possession for thirty consecutive days or longer; he shall not be removed from possession except in a special proceeding. A special proceeding may be maintained under this article upon the following grounds:
(2) The tenant has defaulted in the payment of rent, pursuant to the agreement under which the premises are held, and a demand of the rent has been made, or at least three days' notice in writing requiring, in the alternative, the payment of the rent, or the possession of the premises, has been served upon him as prescribed in section 735. The landlord may waive his right to proceed upon this ground only by an express consent in writing to permit the tenant to continue in possession, which consent shall be revocable at will, in which event the landlord shall be deemed to have waived his right to summary dispossess for nonpayment of rent accruing during the time said consent remains unrevoked. Any person succeeding to the landlord's interest in the premises may proceed under this subdivision for rent due his predecessor in interest if he has a right thereto. Where a tenant dies during the term of the lease and rent due has not been paid and no representative or person has taken possession of the premises and no administrator or executor has been appointed, the proceeding may be commenced after three months from the date of death of the tenant by joining the surviving spouse or if there is none, then one of the surviving issue or if there is none, then any one of the distributees.
N.Y. Real Prop. Acts. § 711(2).

**8.** Chase submitted a proof of a secured claim in the amount of $203,752.22 before the September 21, 1998 bar date. Since that time, Chase has continued to pay the Roswicks' maintenance arrears. In addition, interest on the Mortgage Principle has continued to accrue. I make no finding of the amount of Chase's claim, nor do I rule as to Chase whether its claim is secured or unsecured.

ment. In those sworn statements, he said that they were held as a tenancy by the entirety with Melanie and that their value was "undetermined." In addition, he scheduled his second home located at 672 Daniels Lane in Sagaponic, New York (the "Sagaponic House"), as an asset of his estate, with an "undetermined" value. The Sagaponic House is located in the Hamptons on eastern Long Island, a well-known summer resort for the affluent. By the time he filed his bankruptcy petition, the Roswicks were also in default on the mortgage on the Sagaponic House.

On February 3, 1998, I converted Bruce's case to one under chapter 7 and the Trustee was appointed.[9] The parties agree that the Internal Revenue Service (the "IRS") has a secured claim in the amount of $52,304.78. The IRS also has an unsecured priority claim in the amount of $685,846.42. The parties also agree that Chase has a secured claim in the amount of $236,667.28.[10] In addition, the New York State Department of Labor has a priority unsecured claim against the estate for payroll taxes in the amount of $5,730.07. The balance of the claims against Bruce's estate are general unsecured claims.[11]

Bruce claims that the estate has a valuable asset in the form of accounts receivables. These are the only assets of the estate beyond the Sagaponic House and the Apartment. Bruce, his chapter 11 special counsel

and the Trustee have been unable to collect on these accounts receivables.[12]

On April 22, 1998, the Trustee initiated this adversary proceeding seeking to determine the Roswicks' respective interests in, and to sell, both the Apartment and the Sagaponic House. On November 6, 1998, I lifted the automatic stay to permit Chase to foreclose on the Sagaponic House. That foreclosure was scheduled to occur shortly after the conclusion of this trial. Accordingly, the Trustee withdrew those causes of action involving the Sagaponic House. There is agreement that Melanie and the Trustee will share any excess from the sale after the liens on the house have been satisfied.

### E. Availability of other Suitable Apartments

The Trustee testified that Melanie would realize at least $311,000 as a result of a sale of the Apartment. Melanie testified that she would be unable to purchase an apartment in Carnegie Hill, comparable to her current residence, for that amount of money. She testified that "you cannot do anything for $300,-000." Tr. of 2/1/99 at 142.[13] She conceded, however, that she, personally, has not investigated apartments to purchase or rent.

Jonathan Edwards ("Edwards"), a real estate broker with Douglas Elliman, and Hannah McAllister ("McAllister"), a real estate broker with Robert E. Hill, testified on behalf of the Trustee concerning the availability of apartments in New York City.[14] Pulitzer

---

**9.** Bruce appealed my conversion order, but did not seek a stay. The appeal is pending before the District Court.

**10.** The parties, in their Joint Pre–Trial Order, stipulated that Chase's claim against the estate was secured for approximately $203,000. The Roswicks did not put on evidence to refute Chase's secured status, although they argued that it might be unsecured. For the purposes of this trial, I will treat Chase's claim as secured. I do not reach any conclusions on the ultimate issue of whether Chase's claim is secured or unsecured. In addition, I analyze the Trustee's claims using the McClinton testimony that Chase's claim was in the amount of $236,667.28, which is to the Roswicks' benefit because it reduces the amount that both the Trustee and Melanie would receive from a sale.

**11.** I note that Melanie filed a secured claim for an "undetermined" amount against Bruce's estate. She withdrew her claim during trial.

**12.** However, it appears that even if the trustee collected all of Bruce's accounts receivable and sold all of his property, his general unsecured creditors would only receive a portion of what he owes them.

**13.** "Tr. of ___" indicates the trial transcript of date noted.

**14.** Specifically, Edwards testified about the Roswicks' potential to purchase or rent apartments in Carnegie Hill and the surrounding area. McAllister testified about the Roswicks' potential to purchase or rent apartments in the Riverdale section of the Bronx. Riverdale is bounded by the Hudson River and Broadway, to the west and east, and 263rd Street and Kappock Street, to the north and south. Riverdale is considered to be an upscale section of the Bronx.

testified on behalf of the Roswicks. Pulitzer's testimony was limited to the availability of apartments in Carnegie Hill. Each of them was credible. They were, in large part, consistent. Each broker considered the Roswicks' history of mortgage and maintenance default, earning capacity and Bruce's ongoing bankruptcy case. Considering these factors, each opined that the Roswicks would find it difficult to obtain cooperative board approval to purchase an apartment in Carnegie Hill or in most other Manhattan neighborhoods. McAllister testified, however, that she knew of certain Riverdale apartments in the process of conversion to cooperative ownership, where apartments were held by sponsors, which the Roswicks would probably be able to purchase without cooperative board approval. The experts agreed that in Manhattan and Riverdale the sale of sponsor-held apartments usually did not require cooperative board approval. The sales of condominium apartments usually do not require approval by the board of managers. Single family homes, of course, require no such approval.

Edwards and McAllister also testified on the availability of apartment rentals in other New York City neighborhoods. Edwards opined that the Roswicks could successfully find a rental apartment just outside Carnegie Hill on York Avenue. He testified that comparably sized apartments were available on York Avenue ranging in rent from $ 3,850 per month to $ 5,326 per month.

McAllister opined that the Roswicks could, alternatively, find a rental apartment in a full service, doorman building in the Riverdale section of the Bronx, where their son John attends school, at a much lower rent. She testified that comparably sized apartments, with amenities such as river views and communal swimming pools were available in Riverdale ranging in rent from $2,500 per month to $4,000 per month. No one testified about the Roswicks' potential to rent an apartment in any other New York City neighborhood or their potential to purchase a two or three-bedroom home, for cash, in a New York suburb.

## F. Non–Economic Factors

Melanie testified that, if the Apartment is sold, certain noneconomic factors, including the emotional trauma of moving from the Apartment, would outweigh any benefit to the estate. Indeed, it is her testimony that she will be "ill and devastated" if forced to move. See Tr. of 2/1/99 at 137.

Melanie has a clear emotional attachment to the Apartment. It has been her family's residence for the past thirteen years and the place where she raised her children. Her family and friends gather there several times a year to celebrate religious holidays and other events. It is where she sat Shiva for her father in 1994. I have no doubt that Melanie will be deeply saddened if the Trustee successfully sells the Apartment and the Roswicks are forced to find another residence.

At one time, the Roswicks worshiped at the Park Avenue Synagogue, a large Conservative congregation of more than 6,000 members in Carnegie Hill. Rabbi David H. Lincoln has led the Park Avenue Synagogue for the past eleven years. Melanie testified that she has an important relationship with Rabbi Lincoln and, if forced to move, that relationship would be severed and cause her severe emotional disturbance. Rabbi Lincoln testified that his relationship with Melanie was, at best, "casual." Tr. of 1/29/99 at 16. In 1992, the Roswicks resigned as members from his Park Avenue Synagogue. They currently worship at the Central Synagogue, a Reform congregation outside Carnegie Hill at 55th Street and Lexington Avenue. However, Melanie testified that she sometimes attends services at the Park Avenue Synagogue. Rabbi Barrie Modlin, the Executive Director of the Park Avenue Synagogue, testified that some of its members travel by public transportation and automobile to synagogue services.

Melanie also testified that she had long and cordial relationships with local merchants and numerous friendships in the Carnegie Hill community. She and Pulitzer testified that she would be a more effective real estate sales person in Carnegie Hill if she continued to live there.

## F. Psychiatric Harm

The Roswicks proposed to introduce psychiatric testimony to demonstrate that the sale of the Apartment and a forced relocation will have a detrimental psychological impact upon them. Despite the opportunity to do so, neither did. Although there was some limited hearsay testimony relating to this, there was no evidence on which I can make a finding.

## G. Credibility

In weighing the facts, I must start with the finding that the Roswicks were not credible witnesses. Certainly, they were upset at the thought of losing the cornerstone of their affluent lifestyle, their million-dollar cooperative apartment. But, they showed no realization of the fact that they cannot afford to live the way they do. Rather, they seem to view their apartment and affluent lifestyle as an entitlement to be protected at any cost.

They appear to ignore how their creditors have been subsidizing them. For years the Roswicks have not paid taxes, debt service on the Apartment or the Sagaponic House or maintenance charges on the Apartment. Yet, they appear as oppressed, rather than repentant. They left me with a clear impression that they would say or do anything to frustrate the sale of the Apartment.

Melanie's fabrication of a close relationship to Rabbi Lincoln of the Park Avenue Synagogue is but one example of her unreliability as a witness. Clearly, she thought that no one would challenge her assertion of a close relationship with the Rabbi. As it turns out, the Roswicks resigned from the Rabbi's congregation years ago and now belong to a congregation in another neighborhood. Rabbi Lincoln barely knows Melanie. Her connection with him is so tenuous that she and Bruce had to visit the Rabbi shortly before he testified before me to remind him that he knew them.

Bruce was no more reliable. He offered so many different stories about the ownership of the Apartment, he seemed to have trouble keeping track of them. In tracking his twisting and turning, one must keep in mind that Bruce is a skilled lawyer with particular expertise in bankruptcy and real estate law.

Bruce testified that he and Melanie purchased the Apartment as joint tenants, with right of survivorship. Yet, he listed his interest in the Apartment in the sworn schedules he filed with his voluntary bankruptcy petition as a tenancy by the entirety. During this litigation, he asserted and then withdrew a claim that his sons had an interest in the Apartment because he used their trust fund to purchase it. He continues to assert that, as a result of the Eviction Proceeding, his interest in the Apartment was extinguished in 1995.

The Trustee's counsel challenged him on cross examination about his apparently inconsistent positions, each under oath, as to his interest in the Apartment. He replied that although he had listed an interest for himself in his bankruptcy petition in the entirety with his wife, he believed that he had no interest at the time he did it, and that there was no harm because he listed the value of his interest as "undetermined," which could be construed as none. That exchange is illustrative of Bruce's lack of concern for truth and accuracy in his sworn statements.

## H. Weighing the Proof

It is a reality of our bankruptcy system that nondebtor spouses feel the effects of a sale of assets. Congress designed § 363(h) so that I balance the detriment to the nondebtor against the benefit to the estate. The detriment here is that Melanie, despite receipt of at least $311,000 for her share of the Apartment, will be deeply saddened if she, and her family, are forced to move. If forced to move, she believes that she is entitled to live in the same neighborhood at the same standard of living. Nothing less will be satisfactory. Unfortunately, Melanie's sadness, without more, cannot stand in the way of the Trustee's sale of the Apartment and payment of estate assets to creditors.

I do not credit Melanie's argument that she suffers the degree of hardship necessary to avoid a sale of the Apartment because she will have to move out of the

Carnegie Hill neighborhood. The test, I believe, requires her to demonstrate that the detriment to her exceeds the inconvenience ordinarily attendant in having to change one's residence or live in an adequate but more modest abode. Her proof at trial did not meet this test.

## DETERMINATION OF THE ROSWICKS' INTEREST IN THE APARTMENT

The Trustee contends that Bruce owns the Apartment alone. He argues that Melanie made no financial contribution toward mortgage or maintenance payments and, thus, is not entitled to any of the proceeds of the sale. He concedes, however, that Melanie's interest in the Apartment may be 50%. Conversely, the Roswicks argue that the value of Melanie's joint tenancy with right of survivorship interest in the Apartment equals 90–95% of the proceeds of any sale. They also contend that Bruce's interest in the Apartment was extinguished in 1995, before he filed his Chapter 11 petition, by the Eviction Proceeding.

### A. Joint Tenancy

■ New York State law controls on questions of interests in property. *See In re Rerisi,* 172 B.R. 525, 527 (Bankr.E.D.N.Y.1994) ("Unless the Bankruptcy Code or bankruptcy case law create other legal rights, the rights of parties to an interest in real property are established by applicable state law."); *In re Liggett,* 118 B.R. 213, 216–17 (Bankr. S.D.N.Y.1990) (court applied New York State law to determine debtor's interest in real property).

■ The Roswicks' Proprietary Lease and Cooperative shares clearly indicate on their face that they are held as joint tenants, with right of survivorship. A strong presumption exists that joint tenants hold the property in equal interests. *See In re McKelway's Estate,* 221 N.Y. 15, 20, 116 N.E. 348 (1917) ("[j]oint tenants, by reason of the combination of entirety of interest with the power of transferring in equal shares, are said to be seized *per my et per tout,* or by the half and the whole...."); *In re Lorch's Estate,* 33 N.Y.S.2d 157 (Sur.Ct. Queens County 1941);

*In re Cotter's Will,* 159 Misc. 324, 325, 287 N.Y.S. 670, 672 (Sur.Ct. Kings County 1936) (principles of joint tenancy apply equally to personalty and realty); 24 N.Y.Jur.2d *Cotenancy & Partition* § 21 (1982) ("the law regards each joint tenant as the tenant of the whole for the purpose of tenure and survivorship, while for the purpose of alienation and forfeiture each has an undivided share only."). The Roswicks offered neither evidence nor legal authority to rebut the presumption that if Bruce has an interest in the joint tenancy, it is less than half.

### B. Melanie Roswick's Interest

■ The Trustee's argument brings to the fore the issue of economic contribution by stay-at-home spouses. The Trustee argues, unpersuasively and without legal authority, that Melanie is not entitled to any proceeds from the Apartment's sale because she made no financial contribution to pay the mortgage or maintenance. He is wrong.

■ First, when a husband obtains joint property with his wife, she thereby receives a gift of one-half of the value of the property. *See Granwell v. Granwell,* 20 N.Y.2d 91, 281 N.Y.S.2d 783, 228 N.E.2d 779 (1967). Second, although Melanie earned only $7,000 since 1980, her contribution to the marriage cannot be measured only in dollars and cents. By running their home, she enabled Bruce to become a successful bankruptcy attorney. Nursing and raising children and daily maintenance of a home are a form of "sweat equity." The Trustee asks me to ignore her work. I will not. Accordingly, I reject the Trustee's argument that Bruce owns all of the Apartment. *See* N.Y. Dom. Rel. § 236(B)(5)(d)(6) (In determining equitable distribution of property, the court shall consider "any equitable claim to, interest in, or direct or indirect contribution made to the acquisition of such marital property by the party not having title, including joint efforts or expenditures and contributions and services as a spouse, parent, wage earner and homemaker, and to the career or career potential or the other party"); *Hartog v. Hartog,* 85 N.Y.2d 36, 47, 623 N.Y.S.2d 537, 647 N.E.2d 749 (1995) (discussing that the legis-

lative history of New York's Domestic Relations Law indicates an intent to "treat the marriage as an economic partnership and, in so doing, to recognize the direct and indirect contributions of each spouse, including homemakers."); *O'Brien v. O'Brien,* 66 N.Y.2d 576, 584–85, 498 N.Y.S.2d 743, 489 N.E.2d 712 (1985).

## C. *The Eviction Proceeding*

 Bruce argues that his legal interest in the Apartment was terminated pursuant to the Eviction Proceeding. He argues that Melanie is the sole owner of the Apartment and, thus, it is not an asset of the Estate. Under New York law, a warrant of eviction terminates the landlord/tenant relationship. *See* N.Y. Real Prop. Acts. § 749(3).[15] However, if the Eviction Proceeding court lacked jurisdiction, its warrant of eviction is invalid. *See 114 E. 84th St. Assocs. v. Albert,* 128 Misc.2d 753, 753–55, 490 N.Y.S.2d 951, 952 (N.Y.Civ.Ct.1985). Such is the case here.

Bruce conceded that he knew that the Rent Demand, Notice of Petition and Petition were defective when he defaulted in the Eviction Proceeding. The question is what effect that has on the Eviction Proceeding and the Warrant of Eviction ultimately issued by the New York City Civil Court.

 The requirements for Petitions and other documents in summary proceedings are strictly enforced by the courts. *See New York Infirmary–Beekman Downtown Hosp. (Booth House) v. Sarris,* 154, Misc.2d 798, 802, 588 N.Y.S.2d 748, 751 (N.Y.Civ.Ct. 1992); *Century Paramount Hotel v. Rock Land Corp.,* 68 Misc.2d 603, 608, 327 N.Y.S.2d 695, 701 (N.Y.Civ.Ct.1971); *Margolies v. Lawrence,* 67 Misc.2d 468, 469–70, 324 N.Y.S.2d 418, 420 (N.Y.Civ.Ct.1971); *But see Lanz v. Lifrieri,* 104 A.D.2d 400, 401, 478 N.Y.S.2d 722, 723 (App. Div.2d Dep't 1984)

(indicating that court will not treat "de minimis variations from strict compliance as jurisdictional defects."); *Cucinotta v. Saljon Enters.,* 140 Misc.2d 681, 683, 532 N.Y.S.2d 39, 41 (N.Y.Civ.Ct.1988). This proceeding was rife with defects.

● In New York State, a proper rent demand is a jurisdictional prerequisite to the maintenance of a nonpayment summary proceeding. *See* N.Y. Real Prop. Acts. § 711(2); Finkelstein & Ferrara, *Landlord and Tenant Practice in New York,* 14:14 (West 1999). A nonpayment summary proceeding must be preceded by a "rent demand," of no less than three days before commencement of the summary proceeding. However, the parties may extend the rent demand period by agreement. Here, the Proprietary Lease extended the statutory notice period to five days. The demand here, though, was a three-day demand, only to Bruce, to pay an entity named "40 East 88th Street Owners Corp." The Cooperative is "40 East 88th Street Owners, Inc."

● Melanie was not named as a party to the proceeding, although she was a necessary party. *See* N.Y. C.P.L.R. 1001 ("Persons who ought to be parties if complete relief is to be accorded between the persons who are parties to the action or who might be inequitably affected by a judgment in the action shall be made plaintiffs or defendants.") & 1003 ("Nonjoinder of a party who should be joined under section 1001 is a ground for dismissal of an action without prejudice unless the court allows the action to proceed without that party under the provisions of that section.").

● The named plaintiff was "40 East 88th Street Owners Corp." The correct

**15.** Subsection 3 of § 749 of the New York Real Property Actions and Proceedings Law provides:
The issuing of a warrant for the removal of a tenant cancels the agreement under which the person removed held the premises, and annuls the relation of landlord and tenant, but nothing contained herein shall deprive the court of the power to vacate such warrant for good cause shown prior to the execution thereof. Petition-

er may recover by action any sum of money which was payable at the time when the special proceeding was commenced and the reasonable value of the use and occupation to the time when the warrant was issued, for any period of time with respect to which the agreement does not make any provision for payment of rent.
N.Y. Real Prop. Acts. § 749(3).

name of the Cooperative is "40 East 88th Street Owners, Inc." The petition must accurately describe the petitioner. *See Zirinsky v. Violet Mills, Inc.,* 152 Misc.2d 538, 541, 578 N.Y.S.2d 88, 91 (N.Y.Civ.Ct.1991) (noting that failure to properly name landlord was a defect requiring dismissal if prejudice occurs).

- The premises for which petitioner sought a judgment of possession were described as "40 East 80th Street Apartment 11–F." The Apartment is located on 88th Street. The petition must properly describe the premises. *See Papacostopulos v. Morrelli,* 122 Misc.2d 938, 939–40, 472 N.Y.S.2d 284, 286 (N.Y.Civ.Ct.1984). Failure to do so deprives the court of subject matter jurisdiction because "it affects the very essence of the proceeding." *Id.* at 939, [472 N.Y.S.2d 284]. Had a city marshal attempted to execute the Warrant of Eviction, he would have had the wrong address.

■ Bruce asserts that the doctrine of collateral estoppel prevents any result other than that his tenancy was terminated pursuant to the Eviction Proceeding. I disagree.

The Supreme Court has defined collateral estoppel as follows: "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980) (citations omitted). The *Allen* Court specifically addressed the policy and importance of federal courts applying collateral estoppel to state decisions.

> The federal courts generally have also consistently accorded preclusive effect to issues decided by state courts.... [C]ollateral estoppel not only reduce[s] unnecessary litigation and foster[s] reliance on adjudication, but also promote[s] the comity between state and federal courts that has been recognized as a bulwark of the federal system.

*Id.* at 95, 101 S.Ct. 411.

However, "[a] fundamental precept of common-law adjudication, embodied in the ... doctrine of collateral estoppel ... is that a 'right, question or fact distinctly put in issue and directly determined *by a court of competent jurisdiction* ... cannot be disputed in a subsequent suit between the same parties or their privies....' " *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979) (*quoting Southern Pac. R.R. Co. v. United States,* 168 U.S. 1, 18 S.Ct. 18, 42 L.Ed. 355 (1897)) (emphasis added). The Debtor's collateral estoppel argument is inapplicable because the Landlord and Tenant court lacked jurisdiction to terminate the tenancy because of the many defects in the Eviction Proceeding that rendered it jurisdictionally defective on its face.

Accordingly, I reject Bruce's argument that collateral estoppel bars any finding other than that the Eviction Proceeding resulted in a termination of his tenancy of the Apartment. *See McDaniel v. Camp (In re Camp ),* 59 F.3d 548, 550 (5th Cir.1995) (if a court that renders a prior judgment lacked jurisdiction, "the judgment is void and has no res judicata effect.").

■ Even if the Warrant of Eviction was not jurisdictionally defective and Bruce's tenancy was terminated by the Eviction Proceeding, the Cooperative's acceptance of maintenance payments from Chase after the Roswicks' default reinstated the tenancy. *See* N.Y. Real Prop. § 232–C. In March 1995, the Roswicks ceased paying their monthly maintenance on the Apartment. The Eviction Proceeding was commenced and, ultimately, in October 1995, Chase cured the Roswicks' default with the Cooperative. Indeed, Chase has continued to pay the Roswick's maintenance since 1996. The Roswicks argue that a tenancy was not reinstated because the rent payment, accepted by the Cooperative, did not come from them. The Roswicks position is inapposite to the facts. The Recognition Agreement, which was signed and approved by the Roswicks, specifically authorizes Chase to make maintenance payments, on their behalf, to the Cooperative.

■ Moreover, I believe that even in the absence of the Recognition Agreement, the Roswicks' tenancy, to the extent it was

ever terminated, was reinstated by the Cooperative's continued acceptance of rent from Chase. Acceptance of rent, without more does not reinstate the relationship. *See EBG Midtown S. Corp. v. McLaren/Hart Envt'l Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 595 (S.D.N.Y.1992), *aff'd*, 993 F.2d 300 (2d Cir.1993) (citations omitted). It is the landlord's intent that controls whether the tenancy is revived. *See id.* (citations omitted). "Such intent may be inferred from intentional, affirmative actions of the parties involved." *Id.* (citations omitted). Chase does not assert a right to the tenancy and the Cooperative has accepted payment from Chase for three years without objection. Indeed, the Roswicks have remained in undisturbed possession and the Cooperative has not actually evicted them from the premises. Thus, even in the absence of the Recognition Agreement, it is clear that it was the parties' intent to maintain the Roswicks' tenancy with the Cooperative.

■ In essence, the Roswicks ask me to find that, as a matter of law, the Eviction Proceeding resulted in a termination solely of Bruce's tenancy and an assignment of his 50% interest in the lease and transfer of the appurtenant shares to Melanie. This argu-

ment is belied by the law. A cooperative's proprietary lease and appurtenant shares are inseparable. *See United States v. 110–118 Riverside Tenants Corp.*, 886 F.2d 514, 517 (2d Cir.1989), *cert. denied*, 495 U.S. 956, 110 S.Ct. 2560, 109 L.Ed.2d 743 (1990); *Schachter v. Lefrak (In re Lefrak )*, 227 B.R. 222, 226 (S.D.N.Y.1998); *Sansol Indus., Inc. v. 345 E. 56th St. Owners, Inc.*, 159 Misc.2d 822, 824–25, 606 N.Y.S.2d 856, 857–58 (Sup.Ct. N.Y. County 1993). Indeed, cooperative shares have no value independent of the proprietary lease. *See 110–118 Riverside Tenants Corp.*, 886 F.2d at 517.

Paragraph 16 of the Proprietary Lease governs assignment of the lease and appurtenant shares.[16] One of the conditions in the Proprietary Lease is that an assignment of the Lessee's shares shall be ineffective without the consent of the Cooperative. The Roswicks provided no evidence that the Cooperative consented to an assignment of the lease and transfer of the shares to Melanie, thus making her the sole tenant under the lease and owner of the shares. Indeed, in the four years since the Eviction Proceeding, the Roswicks have made no attempt to assign the lease or transfer the shares pursuant to the terms of the Proprietary Lease. Only

---

**16.** Paragraph 16 to the proprietary lease of the Apartment provides, in relevant part:

16. (a) the Lessee shall not assign this lease or transfer the shares to which it is appurtenant or any interest therein, and no such assignment or transfer shall take effect as against the Lessor for any purpose until

 (i) An instrument of assignment in form approved by Lessor executed and acknowledged by the assignor shall be delivered to the Lessor; and

 (ii) An agreement executed and acknowledged by the assignee in form approved by Lessor assuming and agreeing to be bound by all the covenants and conditions of this lease to be performed or complied with by the Lessee on and after the effective date of said assignment shall have been delivered to the Lessor, or, at the request of the Lessor, a new lease in the same form for the remainder of the term, in which case the Lessee's lease shall be deemed cancelled as of the effective date of said assignment; and

 (iii) All shares of the Lessor to which the lease is appurtenant shall have been transferred to the assignee, with proper transfer taxes paid and stamps affixed; and

 (iv) All sums due from the Lessee shall have been paid to the Lessor, together with such sum as the Directors shall have fixed to cover reasonable legal and other expenses of the Lessor and its Managing Agent in connection with such assignment and transfer of shares; and

 (v) A search or certification from a title or abstract company as the Directors may require; and

 (vi) Except in the case of an assignment, transfer or bequest to the Lessee's spouse, of the shares and this lease, consent to such assignment shall have been authorized by resolution of the Directors, or given in writing by a majority of the Directors; or, if the Directors shall have failed or refused to give such consent within 30 days after *submission of references to them of* Lessor's agent, then by lessees owning of record at lease 6.5% of then issued shares of the Lessor. Consent by lessees as provided for herein shall be evidenced by written consent or by affirmative vote taken at a meeting called for such purpose in the manner as provided in the by-laws.

now, in a desperate attempt to thwart the Trustee's sale of the Apartment, do they so argue. The Eviction Proceeding did not result in an assignment of Bruce's interest in the lease and transfer of his shares. *See In re Lefrak*, 227 B.R. at 228–29 (an attempted assignment of a cooperative lease was invalid where assignment did not comply with cooperative bylaw and lease requirements).

Summarized, Bruce argues that his tenancy was terminated when he received the eviction papers, recognized that they were defective and permitted the Cooperative to enter a judgment he knew was defective against him. He then permitted Chase to pay his rent for years, allowing him and his family to reside in the Apartment rent-free, but denies that the rent was paid on his behalf so as to reinstate the tenancy.

He testified that he "knew" that the warrant in the eviction proceeding terminated his interest in the Apartment before he listed an interest in it on his sworn bankruptcy schedules. His conduct goes beyond slick lawyering. He either intended to mislead his creditors and the Court when he filed his bankruptcy petition or them later by his convenient denial of any interest in the Apartment.

The effect of his argument is double edged. First, Melanie would be the sole owner of the Apartment. Thus, he contends the sale of the Apartment would provide no benefit to the estate. However, the sharper edge of that sword is that while he would be relieved of his maintenance and mortgage obligations to the Cooperative and Chase, both pre- and post-petition, Melanie would be left holding the bag on those obligations. If this were the law, any co-tenant could abandon his or her co-tenants and saddle them with significant financial obligations.

His argument and logic are not only flawed, they are an affront to justice. The foundation for his hypothesis is that a joint tenant can allow his interest in the joint property to be terminated and be relieved of his obligations concerning the property by a proceeding that omits his joint tenant, even though she would then have the burden of his obligations. He further appears to argue that effectively he can use this defective summary proceeding to transfer his property to his wife to the detriment of his creditors.

I find that Bruce's bankruptcy estate and Melanie each own a 50% interest in the Apartment.

## DETERMINING THE TRUSTEE'S AUTHORITY TO SELL THE ROSWICKS' INTERESTS IN THE APARTMENT

The Trustee seeks authorization to sell the Roswicks' interest in the Apartment. He received an offer for the Apartment of $975,-000. The Trustee submits that he satisfies all of the criteria of § 363(h) of the Code. Specifically, he argues that the benefit to the estate from the sale will outweigh any economic or noneconomic detriment to Melanie. The Roswicks, of course, aver that the noneconomic detriment to Melanie outweighs the economic benefit to the estate resulting from a sale of the Apartment.

### F. *The Trustee's Proof of Benefit to the Estate*

■ In order to permit the Trustee to sell the Roswicks' Apartment, he must meet his burden under § 363(h) of the Code. First, he must demonstrate that partition of the property between the co-owners is impracticable. *See* 11 U.S.C. § 363(h)(1). "Where property is a single family residence, there is no practicable manner of partition other than a sale and division of the proceeds." *Bakst v. Griffin (In re Griffin )*, 123 B.R. 933, 935 (Bankr.S.D.Fla.1991). *See Grabowski v. Sapir (In re Grabowski )*, 137 B.R. 1, 3 (S.D.N.Y.1992) ("clearly, as the property is a single residence, partition would be impracticable."). The Apartment is a single family residence. Accordingly, I find that physical partition of the Apartment is impracticable.

■ Second, the Trustee must show that sale of the estate's undivided interest in the Apartment would realize significantly less for the estate than sale of such property free of the interests of such co-owners. *See* 11 U.S.C. § 363(h)(2). It is undisputed that a sale of the estate's undivided 50% interest in the Apartment alone would realize substantially less than a sale of the Apartment to-

gether with Melanie's interest. *See In re Griffin,* 123 B.R. at 935; *see also In re Vassilowitch,* 72 B.R. 803 (Bankr.D.Mass. 1987). A "co-owner's undivided one-half ownership interest chills any prospective purchase of the estate's interest [when such co-owner] currently resides on the property and could prevent the sale of the property indefinitely." *In re Griffin,* 123 B.R. at 935–36.

■ Finally, the Trustee must show that the benefit to the estate of a sale of the

Apartment, free of the interests of co-owners, outweighs the detriment, if any, to Melanie. *See* 11 U.S.C. § 363(h)(3). This prong of the § 363(h) test is the central issue here. The Trustee testified that the estate received two offers for the purchase of the Apartment. The higher bid, $975,000, is the basis of the Trustee's calculations. The Trustee testified that if the estate accepted the offer for $975,-000, he would be able to make a significant distribution. He testified to the following distribution analysis:

| | |
|---|---|
| $975,000.00 | Offer to Purchase the Apartment |
| ($ 58,500.00) | Payment of 6% sale commission to Douglas Elliman |
| $916,500.00 | subtotal |
| ($ 5,000.00) | Payment of Legal fees |
| $911,500.00 | subtotal |
| ($236,667.28) | Payment to Chase on secured claim |
| $674,832.72 | subtotal |
| ($ 52,304.78) | Payment to IRS on secured claim |
| $622,527.94 | Balance after payment of secured claims and closing costs |

Proposed Distribution:

1. Melanie Roswick—$ 311,263.97 (50% share of sale proceeds)

2. Bankruptcy Estate—$ 311,263.97 (50% share of sale proceeds)

He estimated that the Bankruptcy estate's share would be distributed as follows:

A. $150,000.00 Chapter 7 Administrative Expenses (100%)
B. $ 7,000.00 Chapter 11 Administrative Expenses (100%)
C. $154,263.97 Priority unsecured claims
($5,730.07 to New York State Department of Labor [100% of priority wage claim])
($150,000 to IRS [22% of priority tax claim])

The Trustee argues that this distribution constitutes a significant benefit to the estate. He further asserts that Melanie's detriment, economic and noneconomic, does not outweigh the benefit to the estate. The Trustee has established a benefit to the estate. Thus, the burden shifts to Melanie to establish that her noneconomic detriment outweighs the benefit to the estate.

G. *The Roswicks Claim No Benefit to the Estate*

■ The Roswicks argue that the estate will not benefit because, by their calculations,

the money recovered from the sale of the Apartment will go to pay administrative expenses and the nondischargeable IRS claim. This argument defies logic. Congress designated certain unsecured claims as of particular importance, gave them priority in payment during the bankruptcy and made some of them nondischargeable. Among those claims are certain taxes and administrative expenses, including professional fees. The Roswicks take the illogical position that because other, lower-priority general unsecured creditors will not be paid, the estate will have no benefit.

As to administrative professional fees, Congress clearly disagrees. Indeed, by enacting § 330 in the Bankruptcy Reform Act of 1978, Congress abandoned "conservation of the estate and economy of administration" when it came to paying bankruptcy professionals. *See* 3 *Collier on Bankruptcy* 330.-LH[4] (15th ed.1998). Indeed, Congress recognized that unless bankruptcy professionals were paid on par with other professionals in other fields, those professionals might leave the bankruptcy arena. *Id.* "This approach relies in the 'market' of comparable legal services to assist in determining the level of compensation to be awarded, the purpose of which was to attract competent professionals to bankruptcy practice." *In re The Bennett Funding Group, Inc.,* 213 B.R. 234, 250 (Bankr.N.D.N.Y.1997). *See In re Busy Beaver Bldg. Centers, Inc.,* 19 F.3d 833, 848–56 (3d Cir.1994) (purpose of Code § 330 is to compensate bankruptcy professionals at market rate for nonbankruptcy services); *Novelly v. Palans (In re Apex Oil Co.),* 960 F.2d 728, 733 (8th Cir.1992) (same); *In re Nucorp Energy, Inc.,* 764 F.2d 655, 658 (9th Cir.1985) (same); *In re Drexel Burnham Lambert Group, Inc.,* 133 B.R. 13, 15–16 (Bankr. S.D.N.Y.1991) (same).

As to paying the unsecured tax claim, the argument appears to be twofold. First, since the money is owed to the government there is no real harm if it is not paid. That position does not warrant discussion except to say that Congress appears to have a different view.

They buttress that argument with their second point which is that there is no harm to unsecured claimants with nondischargeable claims if their claims are not paid during the bankruptcy. In essence, they argue that the government should continue to subsidize their lifestyle by deferring payment on what Bruce owes it. The underlying and unproven assumption in this argument is that Bruce will ultimately pay his obligation to the government. There is nothing in the record to support the assumption that he will ever be able to repay the more than $600,000 he owes to the IRS, even over time. He showed neither an inclination to reduce his expenses nor any reason to believe his income will increase.

Even if one accepts Bruce's assumption, there is no reason to make priority, nondischargeable creditors wait for their money if assets are available to pay their claims. Even assuming that the government may be able to wait for payment without substantial harm, other nondischargeable creditors, such as child support creditors, for example, may not. The Roswicks' argument, in essence, that the government is not a real creditor worthy of repayment simply is not supported in either law or fact.

█ It is a benefit to the estate to pay secured creditors, administrative and priority unsecured claims from the proceeds of a sale of property pursuant to § 363(h) of the Code. *See Behm v. Bell (In re Bell),* 80 B.R. 104, 106 (M.D.Tenn.1987) (affirmed bankruptcy court order permitting trustee to sell property and held "payment of administrative expenses and secured and priority liens, which result from the proposed sale, constitutes benefit to the estate."); *H.B. Price, III v. Harris (In re Harris),* 155 B.R. 948, 950–51 (Bankr.E.D.Va.1993) (where property was only asset to estate's creditors, distribution of 100% to secured creditors and 42% to unsecured creditors was a benefit to the estate).

### H. *Melanie's Non–Economic Factors*

Melanie argues that the noneconomic factors that surround the sale of the Apartment are so detrimental to her that I should deny the Trustee's effort to sell the Apartment. She argues that: (1) the sale of the Apartment will make her "ill and devastated"; (2) she cannot obtain an apartment in the same neighborhood at the same standard of living; (3) she has an important relationship with Rabbi David Lincoln of the Park Avenue Synagogue which, if forced to move, would be broken; (4) success in her new career as a real estate broker depends on her familiarity with her neighborhood, Carnegie Hill; (5) she has a strong emotional attachment to the Apartment because it is where her family and friends gather for celebrations and holidays; and (6) it is the only home that her children have known. Melanie's "detriment"

does not tip the balance against the benefit to the bankruptcy estate if the Trustee sells the Apartment.

### 1. The Sale of the Apartment will Make Melanie "Ill and Devastated"

I believe that any nondebtor spouse who is forced to leave their home due to a bankruptcy sale suffers detriment. Congress recognized as much. Section 363(h) of the Code states that a trustee may sell property co-owned by the debtor and another if the benefit to the estate "outweighs the detriment, if any, to such co-owners." 11 U.S.C. § 363(h)(3). Congress did not say that a trustee may sell property co-owned by the debtor and another, unless there was *any* detriment to the co-owner.

For example in *Salem v. Coombs* (*In re Coombs*), 86 B.R. 314 (Bankr.D.Mass.1988), the bankruptcy court denied a trustee's attempt to sell the home of the debtor, which he held by the entirety with his nondebtor wife. The debtor's wife suffered from multiple sclerosis and could not "walk more than a few feet without support and require[d] a wheelchair to travel a distance of much more than that." *Id.* at 316. In addition, the home's entrance and kitchen were customized for her disability. *Id.* The court heard expert medical testimony that "the move that would be required as the result of the sale of the property would likely place additional psychological and physical stress upon [the debtor's wife]." *Id.* Indeed, the court denied the trustee's request to sell the property, in part, because the detriment to the debtor's wife outweighed the benefit to the estate. *Id.* at 318. The court opined that "[t]he sale and consequent move would cause her additional psychological stress that would operate upon a deteriorating mental condition; it would also cause her the physical difficulties inherent in adapting to new surroundings suitable for one who depends upon a wheelchair." *Id.*

I do not hold that a court may only find that the detriment to the nondebtor outweighs the benefit to the estate where the nondebtor experiences a catastrophic condition. I do, however, believe that the nondebtor must demonstrate some extraordinary circumstance, other than inconvenience or emotional attachment, to frustrate the trustee's attempt to sell property. I have little doubt that Melanie will be deeply saddened if her home is sold and she, and her family, are forced to find a new residence. However, she will be no less sad than any other nondebtor spouse who has been forced to relocate after a bankruptcy court has authorized the sale of a home to satisfy debts to creditors. She has not demonstrated any special circumstance.

To the contrary, Melanie has enjoyed the Apartment at the expense of Bruce's creditors. While her husband paid neither taxes nor debt service on the Apartment for years, she has continued her comfortable lifestyle. Indeed, while she reaps the benefit of jointly owning the Apartment with Bruce by contributing sweat equity, it is also fair that she shares some of the burdens of her economic partnership with her husband. Melanie is not an innocent bystander. She knew that there were financial difficulties and she benefitted from Bruce's nonpayment of taxes, debt service and maintenance.

### 2. Melanie Cannot Obtain an Apartment in the Same Neighborhood at the Same Standard of Living

Melanie also argues that I should deny the Trustee's motion because she will not be able to purchase a comparable home in Carnegie Hill. Thus, the issue is whether a trustee's sale of an apartment may be defeated if the nondebtor spouse is not able to acquire equal accommodations in the same elite neighborhood. I conclude that Code § 363(h) does not require that the nondebtor spouse be able to acquire equal accommodations in an elite neighborhood in order for the trustee to sell the joint property. Melanie is correct that she and her husband will be unable to purchase a cooperative apartment in Carnegie Hill. Indeed, they are not likely to be able to rent an apartment in that area either. The Roswicks reside in one of the most prestigious and expensive neighborhoods in New York City. The purchase or rental of an apartment in that area is an expensive undertaking. I do not believe that Code § 363(h) requires me to deny the

Trustee's application if the Roswicks cannot find an apartment in one of the most expensive neighborhoods in New York. If forced to find a new residence, the Roswicks will most certainly have to look outside Carnegie Hill. They view any neighborhood outside Carnegie Hill as an unacceptable step down.

Indeed, if anything, the Roswicks have demonstrated that they cannot afford to live in Carnegie Hill. If I were to accept the Roswicks' position, I would require the Trustee to find them a similar cooperative apartment. Such an apartment would carry the same maintenance and mortgage burdens. These are burdens that the Roswicks cannot meet. Bruce grosses, on average, $120,000 per annum and his wife has no income. The annual maintenance and mortgage obligations on the Apartment are $54,000 (45% of their gross income). Simply put, the Roswicks cannot afford the Apartment or any similar apartment in Carnegie Hill. They have been living their affluent life style by not paying their taxes, debt service or maintenance. The reality is that the only way the Roswicks can afford an apartment in New York City is to move to a more modest neighborhood.

The Roswicks testified that their future earnings could support the Apartment's annual maintenance and mortgage obligations. Melanie stated that her income as a real estate broker, together with her husband's income, will meet their financial obligations. Pulitzer, her own expert testified that she had only a 50% chance of earning $50,000 per year as broker. Nothing in her testimony or personal presentation led me to believe that her probability of success is higher than Pulitzer estimated.

Bruce testified that, despite earning a gross average of $120,000 over the past two years from his law practice, he intends to reduce and change the nature of his practice, from debtor clients to creditor clients, so that he may address possible business schemes. The Roswicks' ability to pay their monthly mortgage and maintenance obligations is not only speculative but dubious. They cannot afford their opulent lifestyle. Neither the Trustee nor Bruce's creditors are required to continue to underwrite it. Even if I were to find for Melanie, I have no doubt that the Roswicks' creditors would swiftly oust them from the Apartment, leaving them no better off than if the Trustee sold it, but leaving Bruce's creditors with nothing.

The Roswicks rely on dicta from *Greene v. Levenhar (In re Levenhar)*, 30 B.R. 976 (Bankr.E.D.N.Y.1983), to demonstrate that a poor rental market prohibits the Trustee's sale of the Apartment. In that case, the bankruptcy court, having already found that the chapter 7 trustee failed to meet his burden of establishing the benefit to the estate, noted:

> [i]t would not be inappropriate to take judicial notice of the fact that in the present [1983] rental market in New York, the ability to pay reasonable rent does not necessarily assure access to acceptable living quarters. Eviction of Mrs. Levenhar from her apartment might, in New York's current rental market, require a sharp reduction in living standards.

*Id.* at 981.

The Levenhars held their apartment by the entirety. *Id.* at 978. The Trustee moved to sell their apartment under the erroneous assumption that Mrs. Levenhar was entitled to a 50% distribution. *Id.* at 979. The court found that the Trustee had not met his burden because Mrs. Levenhar had up to a 95% interest in the sale proceeds of the apartment, which had a fair market value of $42,500. *Id.* at 981. Pulitzer testified only that the Roswicks would be unable to rent or purchase a cooperative apartment in Carnegie Hill. She did not opine as to the rental or cooperative market in any other New York City neighborhood. There are apartments available to rent near Carnegie Hill, as well as others to rent or purchase in other respectable New York City neighborhoods. Edwards and McAllister presented evidence of available apartments, which, generally, had the same number of rooms as the Apartment. Indeed, it is conceivable that the Roswicks could purchase a home, for cash, in several fine New York suburbs.

I find that suitable and reasonable housing will be available to the Roswicks upon the Trustee's sale of the Apartment.

### 3. Melanie has an Important Relationship with Rabbi David Lincoln of the Park Avenue Synagogue

Melanie testified that she has an important relationship with Rabbi Lincoln of the Park Avenue Synagogue and, if forced to move from Carnegie Hill as a result of the sale of the Apartment, that relationship would be destroyed. Melanie is, to some extent, an observant person. Religion, however, is not a central tenet of her life and if forced to move she would be able to worship without detriment. She testified that although she and Bruce are members of Central Synagogue, she sometimes attends parts of the Rosh Hashanah and Yom Kippur services at the Park Avenue Synagogue. The Roswicks did not offer any evidence or testimony that they live by any other strict religious observances. Rabbi Lincoln testified that, despite Melanie's claim that she has a close personal relationship with him, he barely knows her. In short, the Roswicks did not demonstrate that Melanie has any religious impediments that would outweigh a sale of the Apartment.

Melanie relies on *In re Waxman*, 128 B.R. 49 (Bankr.E.D.N.Y.1991), to show that a nondebtor spouse's religious needs may outweigh a benefit to the estate. In that case, a debtor and his wife, who were in their sixties, owned a home in West Hempstead, New York, by the entirety. *Id.* at 50. The couple were Orthodox Jews who moved to that town specifically for religious purposes. *Id.* at 53. The debtor's only creditor had a claim totaling $500,000. The chapter 7 trustee sought to sell their home, while the debtor's spouse sought to purchase the debtor's 10% interest in the home (i.e., $8,000). *Id.* at 50. The bankruptcy court denied the trustee's application to sell their home pursuant to 11 U.S.C. § 363(h) because the detriment to the nondebtor spouse outweighed the benefit to the estate. *Id.* at 53. Indeed, the estate would only gain $8,000 from a sale of their home to satisfy a $500,000 judgment. The bankruptcy court made factual findings that:

5. The Debtor and his wife are practicing Orthodox Jews involved in religious affairs in their orthodox community. The Debtor and his spouse moved to the town of West Hempstead specifically because it was an Orthodox Jewish community and their home is within walking distance of their synagogue. They have maintained their marital residence continuously for twenty-seven (27) years.

6. The prospects of the spouse acquiring a new residence in the same or similarly situated Orthodox Jewish community with the proceeds from a forced sale of the marital residence is highly unlikely.

*Id.*

Here, sale of the Roswicks' home will satisfy all secured creditors, chapter 7 and 11 administrative claims, and some of the unsecured claims. Melanie's religious needs are not a significant detriment that outweighs the benefit to the estate. Rabbi Modlin testified that several of its members take public transportation and automobiles to the Park Avenue Synagogue's services. Melanie testified that she currently takes taxi cabs when she attends services at the Central Synagogue. In *Waxman*, the debtor and his wife were Orthodox Jews whose religious observance required them to walk to synagogue services. Thus, there is no religious observance that impedes Melanie from attending services at the Park Avenue Synagogue if she lives in a different neighborhood. In addition, Melanie's claim that she has a close, personal relationship with Rabbi Lincoln, which will be broken if forced to move, is an overstatement of her religious and spiritual needs. In light of Rabbi Lincoln's testimony that he hardly knows her, I believe Melanie fabricated her claim.

### 4. Melanie's Success in Her New Career as a Real Estate Broker Depends on Her Familiarity with Carnegie Hill

Melanie testified that her career as a real estate broker will be impeded if she is forced to move out of Carnegie Hill. Over the past thirteen years, she has become familiar with the neighborhood and its merchants. No merchants were called to testify to verify her claim. She argues that this knowledge will be a benefit to her career as a real estate broker for that neighborhood. Pulitzer testified that an associate's familiarity with a neighborhood helps with potential sales. She also testified that Greenthal sales associates

are not required to live in Manhattan. Melanie currently has no career as a real estate broker. Although she has passed the New York State real estate salesperson's licensing examination, she is now only a Greenthal trainee. There was no reason offered why she could not start her career in Riverdale or, for that matter, in Rockland County.

Moreover, Pulitzer testified that only half of her trainees actually earn a living as a broker, defined as earning $50,000 per year. Melanie's success as a real estate broker is pure speculation. Her real estate license remains undisturbed by the sale of the Apartment. She may be a real estate salesperson in any borough of New York City or any county in New York State. Brokers may be familiar with many neighborhoods but they do not live in all of them. Nothing prevents her from becoming familiar with any other neighborhood.

### 5. *Other Non–Economic Factors*

█ Melanie argues that the Apartment is the home of her children and where her family and close friends gather to socialize and celebrate holidays. In addition, the Apartment is where she sat Shiva for her father in 1994. Melanie certainly has a deep emotional attachment to the Apartment. However, her emotional ties, alone, cannot thwart the Trustee's sale. The Roswicks' children are twenty and seventeen years old. William Roswick lives out of state at college for the school year and only spends school vacations at home. John Roswick will be a high school graduate by June 1999 and will probably attend college in the fall. They will visit their parents no matter where they live. I suspect that Melanie's friends and family will also visit her no matter where she lives as well.

Melanie has not demonstrated that, as a result of a sale of the Apartment, her detriment will outweigh the economic benefit to the estate. Accordingly, I find that the Trustee has satisfied § 363(h) of the Code and that the benefit to the estate, from the sale of the Apartment, outweighs the detriment to Melanie.

### AFFIRMATIVE DEFENSES

The Roswicks raised several affirmative defenses in Bruce's Answer and Melanie's Amended Answer to the Trustee's Complaint. Before trial, the Trustee moved for summary judgment on his claims as well as to dismiss the Roswicks' affirmative defenses. I denied the bulk of the Trustee's motion, but dismissed several of the Roswicks' affirmative defenses.[17] The following affirmative defenses are at issue before me: [18] (1) the complaint fails to state a claim upon which relief can be granted; (2) this is not a core proceeding; (3) Bruce has no interest in the Apartment that is property of the estate; (4) the Trustee has no interest in the Apartment that is property of the estate; (5) there will be no benefit to the estate from a sale of the Apartment because liens exceed the value; (6) there will be no benefit to the estate because the sale of the Apartment will not generate a contribution to unsecured creditors; (7) the Trustee is estopped from proceeding with the sale because he has failed to pursue other claims on which he could realize income; and (8) the court's equitable discretion. I address each in turn.

First, the Roswicks argue, without more, that the Trustee's complaint fails to state a claim upon which relief can be granted. This affirmative defense is too vague. Moreover, I have reviewed the Trustee's complaint and have granted the relief requested. The Roswicks' respective First Affirmative Defense is dismissed.

Second, the Roswicks assert that this is not a core proceeding. Section 157 of 28 U.S.C. defines core proceedings. It states that "orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate" are core proceedings. Melanie filed a claim in this bankruptcy case. Such is the situation

---

**17.** I dismissed the Roswicks' respective Second, Third, Fourth, Fifth and Sixth Affirmative Defenses. I also dismissed Bruce's Sixteenth Affirmative Defense.

**18.** I do not address those affirmative defenses related to the Sagaponic House because the Trustee withdrew those counts.

here. I have made a finding that Bruce's bankruptcy estate owns 50% of the Apartment and that the benefit of a sale of the entire Apartment outweighs the detriment to the co-owner. The Roswicks' respective Seventh Affirmative Defense is dismissed.

Third, Bruce argues that he has no interest in the Apartment and, thus, it is not property of the estate. Likewise, Melanie argues that the Trustee has no interest in the Apartment. I have made factual findings and legal conclusions that Bruce's bankruptcy estate and Melanie each owns a 50% interest in the Apartment. Accordingly, the Roswicks' respective Eighth Affirmative Defense is dismissed.

Fourth, the Roswicks argue that there is no benefit to the estate from a sale of the Apartment because the liens exceed its value and the sale of the Apartment will not generate a contribution to unsecured creditors. I have made factual findings and conclusions of law that the liens do not exceed the value of the Apartment. I have also found that unsecured creditors will receive a distribution of sale proceeds. Accordingly, the Roswicks' respective Eleventh and Twelfth Affirmative defenses are dismissed.

 Fifth, the Roswicks appeal to my equitable discretion to deny the Trustee's application. The Bankruptcy Court is a court of equity and, in making my determination, I may consider the equities. *See National Labor Relations Bd. v. Bildisco & Bildisco,* 465 U.S. 513, 527, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). I discussed above that throughout this adversary proceeding, and during Bruce's chapter 11 case, the Roswicks have misled me and committed acts which at least bordered on obstruction. The equities here tip heavily in favor of the Trustee and Bruce's creditors. Bruce's Thirteenth and Melanie's Fourteenth Affirmative Defense are dismissed.

Sixth, Melanie asserts that her detriment outweighs any benefit to the estate and, therefore, the Trustee has no legal basis to sell her interest in the Apartment. I found that there is indeed a substantial benefit to the estate as a result of the sale of the Apartment and Melanie will not suffer suffi-

cient detriment to thwart the sale. Melanie's Thirteenth Affirmative Defense is dismissed.

Seventh, the Roswicks argue that the Trustee is estopped from proceeding with the sale because he has failed to pursue other claims on which he could realize income. The Roswicks' claim is irrelevant. I note that for the years in which Bruce operated under chapter 11, neither he nor his chosen counsel was able to collect his accounts receivable, the estate's only other possible asset of note. Even if the Trustee were to collect the accounts receivable, those monies would not be sufficient to pay administrative expenses and the claims of secured and unsecured creditors. Bruce's Fourteenth and Fifteenth Affirmative Defenses and Melanie's Fifteenth Affirmative Defense are dismissed.

### CONCLUSION

Therefore, Bruce H. Roswick's percentage interest in the Apartment is set at 50% which passes to the Trustee; and the Trustee is authorized to sell the Roswicks' interests in the Apartment pursuant to § 363(h) of the Code. The Roswicks' affirmative defenses are dismissed. The Trustee is directed to settle an order on three days notice to the Roswicks, which shall include a proposed date of sale, a provision for newspaper advertising, a schedule for showing the Apartment to possible bidders at a bankruptcy auction, without limitation as to what in the Apartment they may see, and bidding procedures. Settle Order.